# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 23, 2020

Lyle W. Cayce
Clerk

No. 19-20828

Joe Richard Pool, III; Trenton Donn Pool;
Accelevate2020, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

City of Houston; Anna Russell, in her official capacity
as the City Secretary of the City of Houston,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-2236

Before Graves, Costa, and Engelhardt, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:

It is often said that courts "strike down" laws when ruling them unconstitutional. That's not quite right. *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018). Courts hold laws unenforceable; they do not erase them. *Id.* Many laws that are plainly unconstitutional remain on the statute books. Jim Crow-era segregation laws

are one example.[1] *See* Gabriel J. Chin et al., *Still on the Books: Jim Crow and Segregation Laws Fifty Years After* Brown v. Board of Education, 2006 MICH. ST. L. REV. 457 (highlighting the segregationist laws still present in the codes of several states); *see also* Josh Blackman, *The Irrepressible Myth of* Cooper v. Aaron, 107 GEO. L.J. 1135, 1199 (2019) (noting that the Texas law criminalizing sodomy at issue in *Lawrence v. Texas*, 539 U.S. 558 (2003), remains in the state code).

The City of Houston contends that it's being sued for one of these so-called "zombie" laws. Its Charter allows only registered voters to circulate petitions for initiatives and referenda, even though the Supreme Court held a similar law unconstitutional twenty years ago. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 193–97 (1999). This case thus requires us to decide when the threat of continued enforcement is enough to reanimate a zombie law and bring it from the statutory graveyard into federal court.

## I.

Houston is one of more than three hundred Texas cities with a home rule charter. TERRELL BLODGETT, TEXAS HOME RULE CHARTERS 3 (2d ed. 2010). The Charter covers everything from the City's power to regulate crematories to its requirements for streetcar operators. HOUSTON, TEX., CITY CHARTER, art. II, § 15 (hereinafter CHARTER); *id.* art. IV, § 5. This case concerns the Charter's rules for petition-based citizen legislation.

Houston's Charter allows "qualified voters" to place initiatives and referenda on ballots through petitions.[2] *Id.* art. VII-a, § 2; *id.* art. VII-b, §§ 2–

---

[1] Some are trying to repeal such laws. *See, e.g.*, Laura Vozzella, *Virginia Panel Finds Scores of Defunct, Racist Laws It Says Should Be Erased*, WASH. POST, Dec. 6, 2019, at B1.

[2] Initiatives propose new legislation, whereas referenda allow voters to uphold or repeal a law already enacted by the City Council.

3.  These petitions must use a form specified in the Charter that requires circulators to attest by notarized signature that they are "one of the [petition's] signers." *Id.* art. VII-a, § 3.  All signers must be "qualified voters of the City of Houston." *Id.*  To be a "qualified voter," a person must reside in Texas and be "a registered voter." TEX. ELEC. CODE § 11.002(a)(5–6).  As a result, the Charter effectively requires every person signing a petition—including the circulator—to both reside in Houston and be registered to vote there.

A product of the Progressive Era, Houston's citizen petition process, including the rules we have just described, dates back to 1913.  CHARTER, art. VII-b, § 1.  In 1999, however, the Supreme Court held unconstitutional a Colorado law providing that only registered voters could circulate petitions for ballot initiatives.  *Buckley*, 525 U.S. at 193–97.  More than two decades later, the voter-registration and residency requirements remain in the Houston Charter.[3]

The plaintiffs, Trent and Trey Pool, are ineligible to circulate petitions under the Charter's qualified-voter provision.  Neither is registered to vote in Houston: Trent resides in Austin; Trey lives in California.  Trent is an avid petition circulator.  In the past decade, he has petitioned in Texas and other states for Jill Stein, Ted Cruz, and Donald Trump; he has petitioned for medical marijuana referenda; and he has even petitioned for the creation of new political parties.  Trent has such a passion for petitions that he runs a company dedicated to hiring professional circulators.[4]  Trey

---

[3] *Buckley* did not decide the constitutionality of a residency requirement for petition circulators, 525 U.S. at 197, and the City's position on whether a residency requirement is lawful is not clear.  The district court did not think it necessary to resolve this issue because the "residency requirement is subsumed within the voter registration requirement and the two requirements cannot be separated."  Because the City does not appear to press the residency requirement as a separate requirement, we follow the district court's assumption.

[4] Trent Pool's company, Accelevate2020 L.L.C., is the third Plaintiff in this suit.  We refer to the Plaintiffs collectively as "the Pools."

Pool does not have the same experience with petitions as Trent, but he does want to circulate petitions in Houston.

One such petition spawned this lawsuit. A 2019 petition sought to put an ordinance on the Houston ballot that would limit campaign contributions from City contractors to candidates for municipal office. The Pools wanted to help collect signatures for this "anti-pay-to-play" initiative. But the Charter's petition form, with its qualified-voter requirement, prohibited them from legally circulating the petition. They emailed the City of Houston Legal Department, providing notice of their desire to circulate petitions and intent to sue for relief. The City responded the following day but indicated that it had not yet determined its position on the Charter requirements' enforceability.[5] The Pools immediately filed a complaint in federal court, mounting facial and as-applied challenges to the Charter.

The Pools sought a preliminary injunction allowing them to collect signatures for the anti-pay-to-play petition as well as a declaratory judgment that the Charter's voter-registration and residency provisions are unconstitutional, permanent injunctive relief against enforcement of those provisions, and nominal damages. The Pools also filed an emergency motion for a temporary restraining order (TRO), which would allow them to circulate the petition through the deadline of July 9, 2019.

The court granted a TRO, allowing the Pools to circulate the petition for the next week. It compared the Charter's voter-registration requirement to the Colorado law at issue in *Buckley*. The court concluded, however, that the Pools had not demonstrated an injury sufficient to support standing with regard to future petitions.

---

[5] Within a week, however, the City informed the Pools that it would not enforce the Charter's voter-registration requirement.

With the restrictions enjoined, Trent collected forty signatures before the deadline. Those were not enough as the petition lacked enough signatures to put the initiative onto the ballot.

A month later, and without a request from the parties, the district court dismissed the Pools' remaining claims. The court thought that plaintiffs had conceded that the case would be over once the 2019 petition deadline passed.[6] In fact, the Pools continued to seek future relief, including a permanent injunction. The Pools brought this to the court's attention in a motion for reconsideration. But the court, citing the expiration of the deadline and its earlier ruling that the Pools had not shown a sufficient interest in circulating future petitions, concluded that there was no longer a live controversy.

## II.

Although the City now concedes that the qualified-voter requirement is unconstitutional, the question is whether the Pools may obtain a permanent injunction preventing its enforcement. The answer turns on two related but distinct justiciability doctrines: standing and mootness. We review those legal questions de novo. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006) (standing); *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (mootness).

## A.

The dispute over standing focuses on the injury requirement. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[C]hilling a plaintiff's speech"—and circulating petitions is speech, *see Buckley*, 525 U.S. at 186—"is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014)

---

[6] The court reasoned that during the TRO hearing, "the parties agreed that Plaintiffs' claims would be moot at the expiration of the circulation period," but the parties only agreed that *preliminary* injunctive relief would be moot at that point.

(quoting *Hous. Chron. Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)).  This special standing rule for First Amendment cases recognizes that people should not have to expose themselves "to actual arrest or prosecution" in order to challenge a law that infringes on speech.  *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  But not just anyone has standing to bring such a suit.  Plaintiffs like the Pools must show that they are "seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure."  *Id.* (quoting *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 815 (5th Cir. 1979)); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (describing chilled speech as a sufficient injury when it arises from a fear of enforcement that is not "imaginary or wholly speculative").

The easier question is the first half of that inquiry: whether the Pools have shown a likelihood that they will continue to engage in the protected activity.  At least for Trent, that is the case.[7]  Trent has circulated petitions since at least 2008, runs a company devoted to circulating petitions, and says he wants to circulate petitions in Houston in future cycles.  The 2019 anti-pay-to-play petition was not his first involvement with Houston petitions.  Trent organized signature collections in support of the last referendum to reach the ballot, one seeking to undo the Houston Equal Rights Ordinance (HERO) that the City Council enacted in 2014.  Trent's "past enthusiastic participation in the political process" lends credence to his stated desire to circulate future petitions.  *Justice*, 771 F.3d at 291.  Like the *Justice* plaintiffs whose demonstrated history of financial contributions to Mississippi ballot initiative campaigns gave them standing to challenge that state's disclosure requirements, *id.*, Trent's deep connections to the petition process means he has a concrete interest in this issue and is not just manufacturing a lawsuit.

---

[7] Only one plaintiff is needed to establish standing for each form of requested relief. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

The harder question is whether there is a sufficient threat of future enforcement of the qualified-voter requirement. This is where most attempts to challenge a zombie law in federal court would fail. Without any indication that the government is planning to enforce a law after a similar one has been held unconstitutional in a binding decision, there would be no objective fear of continued enforcement.

But two features of this case render the Pools' concern about future enforcement reasonable. To begin, even though the Pools filed this case twenty years after *Buckley*, the petition form still obligated circulators to swear they are "qualified voters of the City of Houston." CHARTER, art. VII-a, § 3. The City counters that this requirement remained on the form because it can be changed only by amending the Charter, which itself requires a successful referendum. But that does not explain why the City failed to inform the public during the two decades following *Buckley* that it would no longer enforce the qualified-voter provision even if it had to remain in the Charter.

Since the filing of this case, the City finally has tried to give that notice. It inserted an "Editor's note" below the offending Charter provisions indicating that "the City will accept petitions circulated by individuals that are not residents of the City or are not registered to vote in the City," with a link to a revised form for nonresidents. CHARTER, art. VII-a, § 3; *id.* art. VII-b, § 2. It is unclear who, or what body, approved the new form. Regardless, when the Pools filed their complaint, they had no assurances that the City would refrain from enforcing the qualified-voter provision. That is what matters for standing. *Friends of Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (explaining that standing focuses on the plaintiff's interest "at the commencement of the litigation"). Indeed, if the City is correct that *Buckley* means the Pools had no reasonable fear the qualified-voter law would be enforced, then there would have been no standing to obtain the TRO the court issued. Whether the postsuit addition

of the "Editor's note" means there is no longer a live controversy is a question of mootness we will address later.

Second, there is an objective basis for believing that the City *has* attempted to enforce the unconstitutional Charter provision since *Buckley*. In 2014, the last time that an initiative or referendum petition made it onto the ballot, the City deposed petition organizers—including Trent Pool— about the validity of signatures they collected in view of the Charter's petition-form requirements. Although concerns about the qualified-voter requirement were not the focus of the litigation that arose out of the HERO referendum, there are some indications that it was an issue. During the HERO litigation, the City argued that "[b]ecause the circulator's affidavit is an express requirement of the City Charter, if a page does not contain a proper circulator's affidavit then, as a matter of law, the signatures on that page are invalid and may not be counted." It stressed that petitions must "be signed and verified '*in the manner and form*' set out in the City Charter." And, of course, the qualified-voter requirement was listed on those petitions. Most on point, the City questioned Trent about whether he, as someone not eligible to vote in Houston, had "sign[ed] any [affidavits] on petition pages" and had gathered signatures alone or "arm in arm" with other circulators. Why would Trent's proximity to circulators who were qualified Houston voters matter if the City were not concerned about that requirement? Given the concerns the City raised during the immediate predecessor to the anti-pay-to-play petition, the Pools had reason to believe the City would be "seriously intent" on continuing to enforce the qualified-voter requirement. *Justice*, 771 F.3d at 291 (citation omitted).

The City analogizes to other zombie laws in arguing why the Pools should not have standing to enjoin this one. At oral argument, its counsel compared the qualified-voter requirement to bans on same-sex marriage that remain on the books after *Obergefell v. Hodges*, 576 U.S. 644 (2015), even though everyone knows they can no longer be enforced. The more apt

analogy to this case would be if a state continued to list the ban on same-sex marriage on the application for a marriage certificate and had questioned some same-sex marriages in litigation.

Although there would not usually be a reasonable fear of continued enforcement of a zombie law, the history of Houston's qualified-voter requirement we have recounted gives Trent Pool standing to seek an injunction that would guard against continued chilling of his speech. This zombie shows signs of life.

B.

But perhaps the City's postsuit disavowal of the qualified-voter requirement moots the Pools' claim. Unlike standing analysis, mootness accounts for such events that occur during the litigation. *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013). It ensures that the plaintiff's personal interest that "exist[ed] at the commencement of the litigation (standing) . . . continue[s] throughout its existence (mootness)." *Id.* (citations omitted). If intervening circumstances make it impossible for the court to "grant any effectual relief," the case is moot.[8] *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation marks omitted).

At least based on the current record, the City's addition of the "Editor's note" on its website does not moot this case. Voluntarily stopping an unconstitutional practice renders a case moot only "if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior c[an] not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. (quotation marks omitted). While we "assume that formally announced

---

[8] The City's argument for mootness is that *Buckley* rendered the voter-registration requirement a zombie law. But that focuses on something that happened before the lawsuit was filed. We thus considered the impact of *Buckley* in the standing inquiry asking whether plaintiffs had a reasonable fear of prosecution to show an injury.

changes to official governmental policy are not mere litigation posturing,"
*Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), it is not
clear the City made a formal policy change. There is no evidence that the
City Council approved the nonresident petition form published on the City's
website, so we do not know how permanent—or legally effective—the new
form and editor's note are.[9] *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir.
2020) ("[A] case challenging a statute, executive order, or local ordinance
usually becomes moot if the challenged law has expired or been repealed.").
*Compare Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 425 (5th Cir.
2020) (holding that officials' representations through legal counsel that their
behavior would change following a recent Supreme Court decision did not
moot case when no official policy retraction had occurred), *with* 13C
CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND
PROCEDURE § 3533.7 (3d ed. Oct. 2020 update) (noting that "a permanent
policy change" can moot a dispute).

In ruling on the request for a permanent injunction, the district court
may consider whether to allow additional evidence concerning the legal
authority behind the new form and the extent to which it is binding. At this
stage in the litigation, however, the City has told us that the new form is
"irrelevant" to our analysis. On its own words then, the City has not met its
"heavy burden" of showing that the Pools' challenges are moot. *Friends of
the Earth*, 528 U.S. at 189.[10]

---

[9] The form itself indicates that it was prepared by the City of Houston Legal
Department—not an official policymaker—on September 17, 2019. *Non-Resident/Non-
Registered Circulator Affidavit for Initiative, Referendum, and Recall Petitions Pursuant to
Article VII-a, VII-b of the City of Houston Charter*, CITY OF HOUS. (Sept. 17, 2019),
http://houstontx.gov/citysec/elections/CircAffidForm.pdf.

[10] Because we hold that the Pools have standing to pursue their claims for
declaratory and injunctive relief, we need not address whether their request for nominal
damages would alone be enough to keep the case alive. It is far from clear that the Pools
have such a claim for damages when the law was not actually enforced against them in 2019.
They instead brought this case to prevent their speech from being chilled. *Contrast*

No. 19-20828

\* \* \*

A reasonable concern that the City might enforce its unconstitutional Charter provision has raised this zombie law from the statutory necropolis. We therefore REVERSE the judgment dismissing this case and REMAND for further proceedings.

---

*Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 343–46 (5th Cir. 2017) (allowing a plaintiff's claim for nominal damages, based on a sanction she incurred, to survive after her claims for equitable relief were mooted).  If the Pools do have a claim for nominal damages, whether that can save a case from mootness is before the Supreme Court.  *See Uzuegbunam v. Preczewski*, 781 F. App'x 824 (11th Cir. 2019), *cert. granted*, 2020 WL 3865254 (U.S. July 9, 2020).