# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 9, 2026

Lyle W. Cayce
Clerk

No. 25-20191

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

SERGIO YOVANI QUINTANILLA-MATAMOROS,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CR-470-1

_____

Before CLEMENT, GRAVES, and HO, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

Sergio Yovani Quintanilla-Matamoros was convicted for failing to register as a sex offender as required by the Sex Offender Registration and Notification Act ("SORNA"). The district court classified Quintanilla-Matamoros as a tier III sex offender and sentenced him accordingly. On appeal, Quintanilla-Matamoros argues that he should have been classified as a tier I offender. We agree, so we vacate Quintanilla-Matamoros's sentence and remand for resentencing.

No. 25-20191

I

In May 2021, Quintanilla-Matamoros was convicted in Texas state court for sexually assaulting a thirteen-year-old child in violation of Tex. Pen. Code Ann. § 22.011(a)(2). He was sentenced to two years of imprisonment, but because he is a Honduran citizen who lacked lawful immigration status, Quintanilla-Matamoros was deported to Honduras in July 2021. He illegally returned to the United States soon after, and in July 2024, he was detained for immigration violations. Quintanilla-Matamoros advised immigration officials that he had been convicted for sexually assaulting his niece, and he acknowledged that he was required to register as a sex offender because of this conviction. But he admitted that he did not register because he did not want to alert Immigration and Customs Enforcement that he had returned to the United States.

Subsequently, Quintanilla-Matamoros pleaded guilty to a one-count indictment charging him with failure to register under SORNA, 34 U.S.C. §§ 20901–20962, in violation of 18 U.S.C. § 2250(a). The presentence investigation report ("PSR") recommended assigning Quintanilla-Matamoros a base offense level of 16 because his sex offense renders him a tier III offender. Based on this offense level, the PSR calculated an advisory Guidelines range of 18 to 24 months of imprisonment. Quintanilla-Matamoros did not object to the PSR. At sentencing, the district court adopted the PSR's recommendations and factual findings and sentenced Quintanilla-Matamoros to 24 months of imprisonment followed by five years of supervised release. Quintanilla-Matamoros timely appealed.

II

Quintanilla-Matamoros challenges his sentence, arguing that the district court erred by classifying him as a tier III offender. Because he raises this argument for the first time on appeal, we review for plain error. *United*

2

No. 25-20191

*States v. Castaneda-Lozoya*, 812 F.3d 457, 459 (5th Cir. 2016); Fed. R. Crim. P. 52(b). To show plain error, Quintanilla-Matamoros must identify a clear or obvious error that has affected his substantial rights. *Rosales-Mireles v. United States*, 585 U.S. 129, 134 (2018). If he does, we should correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

### III

The government agrees with Quintanilla-Matamoros and concedes that he is not a tier III offender. Quintanilla-Matamoros goes further, though, and argues that he is not a tier II offender, either. We first explain the method for determining a sex offender's tier classification under SORNA. Then, we take up each of Quintanilla-Matamoros's arguments in turn.

### A

SORNA is a federal law that established "a comprehensive national system for the registration" of sex offenders. 34 U.S.C. § 20901. It requires sex offenders to register and keep their registration current, *id.* § 20913, and knowingly failing to do so is a federal crime if the offender travels in interstate or foreign commerce, 18 U.S.C. § 2250. SORNA classifies offenders into three tiers based on the severity of their sex offenses. 34 U.S.C. § 20911(2)–(4). These tiers dictate how long an offender must keep his registration current, *id.* § 20915(a), and they establish the base offense level for sentencing if an offender is convicted for failing to register or update his registration, U.S. Sent'g Guidelines Manual § 2A3.5(a) (U.S. Sent'g Comm'n 2024). Under the Guidelines, the base offense level for a tier III offender is 16, a tier II offender is 14, and a tier I offender is 12. *Id.*

No. 25-20191

Relevant here, a person is a tier III offender if his offense of conviction "is comparable to or more severe than . . . aggravated sexual abuse or sexual abuse" as described in 18 U.S.C. §§ 2241 and 2242. 34 U.S.C. § 20911(4)(A)(i).[1] A person is a tier II offender if he does not qualify as a tier III offender and his offense of conviction "is comparable to or more severe than . . . abusive sexual contact" as described in 18 U.S.C. § 2244. 34 U.S.C. § 20911(3)(A)(iv). If a sex offender cannot be classified as either a tier II or tier III offender, then he is a tier I offender. *Id.* § 20911(2).

We determine a defendant's SORNA tier by employing the categorical approach. *United States v. Escalante*, 933 F.3d 395, 398 (5th Cir. 2019). Under this method, we compare the elements of the defendant's offense of conviction with the elements of the "generic" federal offenses listed in the statute. *United States v. Montgomery*, 966 F.3d 335, 338 (5th Cir. 2020). "The key" to the categorical approach "is elements, not facts." *Descamps v. United States*, 570 U.S. 254, 261 (2013). With one narrow exception,[2] the particular facts underlying a defendant's conviction are irrelevant to this inquiry. *Id.* The relevant question is whether the state offense "'sweeps more broadly' than the SORNA tier definition," in which case the state offense "cannot qualify as a predicate offense for that SORNA tier regardless of the manner in which the defendant actually committed the crime." *Montgomery*, 966 F.3d at 338 (quoting *Descamps*, 570 U.S. at 261). "A

---

[1] Although there are other ways to qualify as a tier III offender, *see* 34 U.S.C. § 20911(4)(A)(ii), (4)(B)–(C), the government concedes that none are relevant here.

[2] "SORNA requires a circumstance-specific inquiry into the victim's age when classifying sex offender tier levels to determine whether the victim was a minor, or, in the case of a tier III categorization under § 20911(4)(A)(ii), whether the victim was younger than 13." *Escalante*, 933 F.3d at 405. We conduct this circumstance-specific inquiry only after we determine that a state offense is comparable under the categorical approach. *United States v. Navarro*, 54 F.4th 268, 279 n.13 (5th Cir. 2022).

4

crime 'sweeps more broadly' when it criminalizes more conduct than the federal crime would reach by its terms." *United States v. Navarro*, 54 F.4th 268, 279 (5th Cir. 2022).

To demonstrate that a state offense is broader than a federal offense, a defendant must show "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). A defendant can do so by identifying "case law from the relevant state courts actually applying the law in a manner that is broader than the federal definition." *Montgomery*, 966 F.3d at 338.

Thus, determining Quintanilla-Matamoros's proper tier level requires us to compare the elements of his 2021 Texas conviction with SORNA's tier definitions. Quintanilla-Matamoros was convicted of sexual assault of a child under Tex. Penal Code Ann. § 22.011(a)(2). A person violates that statute, "regardless of whether the person knows the age of the child at the time of the offense," if he "intentionally or knowingly . . . causes the penetration of the anus or sexual organ of a child by any means." *Id.* § 22.011(a)(2)(A). The statute defines a "child" as "a person younger than 17 years of age." *Id.* § 22.011(c)(1).

B

For Quintanilla-Matamoros to be properly classified as a tier III offender, the Texas offense of sexual assault of a child must sweep no more broadly than either of two federal offenses: sexual abuse or aggravated sexual abuse. *See* 18 U.S.C. §§ 2241, 2242. A person commits aggravated sexual abuse if he "knowingly causes another person to engage in a sexual act" by using force; "threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping"; or rendering the victim unconscious. *Id.* § 2241(a), (b). In this circuit, "the force element

required under this definition is 'restraint sufficient to prevent the victim from escaping.'" *Montgomery*, 966 F.3d at 338 (quoting *United States v. Lucas*, 157 F.3d 998, 1002 (5th Cir. 1998)). As for sexual abuse, § 2242 forbids knowingly (1) "caus[ing] another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)," (2) "engag[ing] in a sexual act" with a person who is mentally or physically incompetent, or (3) "engag[ing] in a sexual act with another person without that other person's consent, to include doing so through coercion." 18 U.S.C. § 2242. Looking to the elements of these offenses, neither statute criminalizes consensual sexual acts; both require some showing that the defendant used force, threats, fear, compulsion, or coercion. *See Montgomery*, 966 F.3d at 338–39.

The Texas statute Quintanilla-Matamoros was convicted under requires no such showing. Rather, the statute "meets a common sense definition of 'statutory rape,'" as it "punishes consensual sexual intercourse with a child" regardless of consent. *United States v. Alvarado-Hernandez*, 465 F.3d 188, 189 (5th Cir. 2006) (per curiam). As Texas courts have interpreted the statute, children under 17 years old are "capable of consent"—meaning they are not mentally incompetent—"but that consent is irrelevant to the offense." *Delarosa v. State*, 677 S.W.3d 668, 675 (Tex. Crim. App. 2023). The statute prohibits intercourse with a child who is 16 or younger, even if the perpetrator does not use or threaten to use force. Indeed, Quintanilla-Matamoros has identified at least one case in which the State of Texas indicted a defendant under the statute without "in any way alleg[ing] a lack of consent." *Hernandez v. State*, 861 S.W.2d 908, 909 (Tex. Crim. App. 1993).

In sum, a person can violate the Texas statute by having consensual intercourse with a child under 17 years old, but that same conduct would not

necessarily violate 18 U.S.C. §§ 2241 or 2242. Thus, Quintanilla-Matamoros's offense of conviction sweeps more broadly than the federal offenses of sexual abuse and aggravated sexual abuse. *See Montgomery*, 966 F.3d at 338–39 (holding that a New Jersey statute is broader than §§ 2241 and 2242 because it criminalizes sexual acts in the absence of force, threats, or fear). As the government concedes, the district court erred by classifying Quintanilla-Matamoros as a tier III offender.

Beyond identifying an error, Quintanilla-Matamoros has satisfied the additional elements to succeed on plain error review. The error is clear under our current law. *See id.* at 339; *see also Navarro*, 54 F.4th at 281 ("It is well-established that this circuit takes a categorical approach to interpreting SORNA's tiers. Nevertheless, the district court treated Navarro as a tier II offender without any meaningful comparison of the state and federal statutes." (footnote omitted)).

The error affected Quintanilla-Matamoros's substantial rights. If a defendant "has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range" and "the record is silent as to what the district court might have done had it considered the correct Guidelines range," then "the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights." *Molina-Martinez v. United States*, 578 U.S. 189, 200–01 (2016). Because Quintanilla-Matamoros is not a tier III offender, his base offense level is at most 14, which (accounting for a two-level reduction for acceptance of responsibility) would result in a Guidelines range of 15 to 21 months of imprisonment. *See* U.S. Sent'g Guidelines Manual § 2A3.5(a) (U.S. Sent'g Comm'n 2024). This range is lower than the range of 18 to 24 months that the district court relied on at sentencing, so the district court mistakenly applied a higher Guidelines range. The record is silent as to what sentence the district court might have applied under the correct Guidelines range, and there are no

unusual circumstances here that suggest we should deviate from *Molina-Martinez*'s general rule. Therefore, Quintanilla-Matamoros has identified a plain error that affected his substantial rights.

This plain error "seriously affects the fairness, integrity [and] public reputation of judicial proceedings." *Molina-Martinez*, 578 U.S. at 194 (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). When, as here, there is a clear Guidelines error that is "reasonably likely to have resulted in a longer prison sentence than necessary and there are no countervailing factors" suggesting that "the fairness, integrity, and public reputation of the proceedings will be preserved absent correction," then we should correct the error. *Rosales-Mireles v. United States*, 585 U.S. 129, 142–43 (2018). We agree with the parties that there are no countervailing factors that obviate the need for error correction. Accordingly, we vacate Quintanilla-Matamoros's sentence and remand for resentencing.

## C

Because we vacate Quintanilla-Matamoros's sentence on the grounds that he is not a tier III offender, it is not strictly necessary for us to address his additional argument that he should be classified as a tier I offender rather than a tier II offender. Nevertheless, "[i]n the interest of judicial efficiency and to provide guidance on remand," *United States v. Murillo-Lopez*, 444 F.3d 337, 339 (5th Cir. 2006), we now consider this issue.

For Quintanilla-Matamoros to be a tier II offender, his offense must be "comparable to or more severe than . . . abusive sexual conduct" as described in 18 U.S.C. § 2244 and "committed against a minor." 34 U.S.C. § 20911(3)(A)(iv). Section 2244, in turn, defines abusive sexual contact as "knowingly engag[ing] in or caus[ing] sexual contact with or by another person, if so to do would violate" one of six cross-referenced federal statutes "had the sexual contact been a sexual act." 18 U.S.C. § 2244(a). Only two of

these cross-referenced offenses are relevant here.[3] First, 18 U.S.C. § 2243(a) prohibits a person from "knowingly engag[ing] in a sexual act with another person" who "has attained the age of 12 years but has not attained the age of 16 years" and "is at least four years younger than the person so engaging." Second, 18 U.S.C. § 2241(c) prohibits "knowingly engag[ing] in a sexual act with another person who has not attained the age of 12 years."

The Texas statute sweeps more broadly than both of these provisions. The Texas statute prohibits intercourse with a person younger than 17 years old, so it criminalizes intercourse with 16-year-olds as well as children under the age of 12. Tex. Penal Code Ann. § 22.011(a)(2), (c)(1). In contrast, § 2243(a) only criminalizes sexual contact with children between 12 and 15 years of age. *See Navarro*, 54 F.4th at 279 (concluding that a Colorado statute "is broader than § 2243(a) because it criminalizes sexual contact with children younger than twelve"). Moreover, under §2243(a), the government must prove that the victim was at least four years younger than the defendant, but the Texas statute does not require the state to prove any age differential.[4] Thus, "[l]ooking solely at the elements" of the two statutes, the Texas statute "criminalizes consensual sexual contact between an 18-year-old and a 15-year-old, whereas the federal statute does not." *Escalante*, 933 F.3d at

---

[3] The other four cross-referenced offenses are either irrelevant or inapplicable. Two of these offenses are sexual abuse and aggravated sexual abuse. 18 U.S.C. § 2244(a)(1), (2) (cross-referencing 18 U.S.C. §§ 2241(a)–(b) and 2242). As explained above, the Texas statute under which Quintanilla-Matamoros was convicted sweeps more broadly than these offenses. The other two provisions, 18 U.S.C. § 2243(b) and (c), require the victim to be a ward of the federal government or in federal custody.

[4] Under the Texas statute, a defendant can raise the affirmative defense that he "was not more than three years older than the victim" at the time of the offense and the victim was at least 14 years old. Tex. Penal Code Ann. § 22.011(e)(2). But "the categorical approach looks *exclusively* to the elements of the offenses to be compared," and "it is black letter law that an affirmative defense . . . is not the same thing as an element of the crime." *Escalante*, 933 F.3d at 399.

402. As for § 2241(c), the Texas statute covers sexual conduct with children between 12 and 16 years old, "but § 2241(c) stops before age twelve." *Navarro*, 54 F.4th at 279; *see also United States v. Walker*, 931 F.3d 576, 582 (7th Cir. 2019) (concluding that a Colorado statute "sweeps more broadly than § 2243(a) because it covers sexual contact against some victims under 12" and "is broader than § 2241(c) to the extent that it covers some victims between the ages of 12 and 15").

These applications of the Texas statute are not merely theoretical possibilities. Quintanilla-Matamoros has identified cases in which the State of Texas prosecuted 19-year-olds for sexually assaulting 16-year-olds. *See Morganfield v. State*, 696 S.W.3d 194, 196 (Tex. App.—San Antonio 2024, no pet.); *United States v. Rodriguez*, 711 F.3d 541, 562 (5th Cir. 2013) (en banc).

In short, the Texas statute sweeps more broadly than either of the relevant federal statutes listed in 18 U.S.C. § 2244. Thus, Quintanilla-Matamoros's Texas conviction is not comparable to or more severe than abusive sexual contact as described in § 2244, and he cannot be classified as a tier II offender. Since he is neither a tier II nor a tier III offender, Quintanilla-Matamoros was required to register as a tier I offender. 34 U.S.C. § 20911(2). On remand, the district court must apply the Guidelines accordingly.

IV

Because Quintanilla-Matamoros is a tier I offender, the district court plainly erred by sentencing him based on a Guidelines range derived from his purported status as a tier III offender. Therefore, we VACATE the sentence and REMAND for resentencing.

No. 25-20191

JAMES C. HO, *Circuit Judge*, concurring in the judgment:

The United States agrees with Sergio Yovani Quintanilla-Matamoros that he is entitled to sentencing relief. I concur with granting that relief based on the agreement of the parties (not to mention that prosecutorial discretion is a quintessential prerogative of the Executive Branch).

I concur only in the judgment, however. It's one thing to issue a judgment based on party agreement—after all, a judgment only binds the parties. It's another thing to issue a precedential decision that binds everyone in the circuit based on party agreement. "[T]he whole point of our adversarial legal system" is that "the robust exchange of competing views" helps "ensure the discovery of truth and avoid error." *Lefebure v. D'Aquilla*, 15 F.4th 670, 674 (5th Cir. 2021). The lack of adversarial process cautions me against joining an uncontested decision that will bind us in all future cases.

That said, I respect that my distinguished colleagues disagree. It's a judgment call on which reasonable minds can differ.

Moreover, I acknowledge that my concern is a purely prudential one. I do not question our *power* to issue today's ruling.

Both Supreme Court precedent and longstanding practice confirm our power to grant relief in cases where the parties agree—notwithstanding the case or controversy requirement and adversity principles of Article III of the Constitution. I write to explain why.

## I.

Our power to grant relief in cases of party agreement has divided members of our court in recent years. *Compare, e.g., Pool v. City of Houston*, 978 F.3d 307, 311–14 (5th Cir. 2020) ("*Pool I*") (party agreement does not preclude relief), *with Pool v. City of Houston*, 87 F.4th 733, 734 (5th Cir. 2023) ("*Pool II*") (party agreement precludes relief); *see also Pool v. City of Houston*,

11

_ F.4th _, _, _ (5th Cir. 2026) (noting concern that *Pool II* "makes no reference to . . . *Pool I*," "in violation of our . . . rule of orderliness, and the law of the case doctrine") ("*Pool III*"). *Compare also United States v. Aguilar-Torres*, 116 F.4th 341, 342 (5th Cir. 2024) (party agreement precludes relief, citing *Pool II*), *with id.* (Willett, J., dissenting) (party agreement does not preclude relief), *and* 130 F.4th 450 (5th Cir. 2024) (vacating *Aguilar-Torres* on grant of rehearing en banc).

This is not just an arcane academic debate for federal jurisdiction professors. How we resolve these issues will have meaningful consequences for the citizens of our circuit. I'll offer one current example.

For years, Texas has offered illegal aliens a 90% discount on the tuition it charges at its universities to out-of-state U.S. citizens. This explicit favoritism of illegal aliens over U.S. citizens is a blatant violation of federal law, as I explained in my dissent in *Young Conservatives of Texas Foundation v. Smatresk*, 78 F.4th 159, 159 (5th Cir. 2023) (Ho, J., dissenting from the denial of rehearing en banc). It also tramples on our Nation's sovereign interest in controlling its borders by encouraging illegal entry into our country. *See id.* at 166 ("Our national objectives are undercut when states encourage illegal entry into the United States.").

So four years ago, a district court dutifully enjoined Texas law. 597 F. Supp. 3d 1062, 1089 (E.D. Tex. 2022). But our court reversed. 73 F.4th 304, 315 (5th Cir. 2023). We then denied en banc review by a lopsided vote. 78 F.4th 159.

Now fast forward to 2025, when the United States filed suit to challenge the Texas in-state tuition discount for illegal aliens. This time, however, Texas officials declined to contest the suit. They conceded that Texas law is invalid—just like the government officials in *Pool II*. So the

district court entered judgment and a permanent injunction against Texas accordingly. *See United States v. Texas*, 2025 WL 1583869 (N.D. Tex.).

Naturally, I agree with the district court on the merits—as my dissent three years ago details. But various student groups have accused the United States and Texas of engaging in a "contrived legal challenge." Eleanor Klibanoff & Jessica Priest, *Judge denies undocumented students' attempt to challenge sudden loss of in-state tuition*, Tex. Tribune, June 11, 2025.

Specifically, they argue that, under *Pool II*, the district court lacked jurisdiction to stop the Texas in-state tuition law for illegal aliens. *See* Emergency Motion to Intervene and Memorandum of Law in Support Thereof of Proposed Defendant-Intervenors La Unión del Pueblo Entero et al. at 1, *United States v. Texas*, No. 7:25-CV-00055-O (N.D. Tex. June 24, 2025) (citing *Pool II*).

But *Pool II* is wrong. It conflicts with Supreme Court precedent and longstanding practice. And it may not be good law in any event: *Pool III* notes that *Pool II* does not even mention (let alone analyze) *Pool I*. Nor does *Pool II* even mention (let alone analyze) the Supreme Court's most recent and relevant rulings, as I will detail below.

## II.

In the in-state tuition case, the parties quite plainly have conflicting interests at the moment of suit. The United States has an obvious interest in vindicating federal law and deterring illegal entry into our country. Likewise, Texas has an obvious interest in enforcing its law (and has done so for years, as my *Young Conservatives* dissent bemoans). So both sides have clear interests at stake, and those interests clearly conflicted with one another at the moment the suit was filed.

So too here. At the outset of this case, the United States has a clear interest in enforcing its criminal laws against all individuals, including Quintanilla-Matamoros. And Quintanilla-Matamoros has a clear interest in preserving his own liberty. So the parties in this case plainly have conflicting interests at the outset of the suit, just as they do in *United States v. Texas*.

That should be enough to establish Article III jurisdiction. After all, it's well established that we determine Article III jurisdiction at the outset of the suit. *See*, *e.g.*, *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957) ("the jurisdiction of the Court depends upon the state of things at the time of the action brought") (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)); *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) (same).

So it shouldn't matter whether the parties subsequently agree on some or all of the contested issues in a case. As long as there is a conflict of party interests at the moment the suit is filed, Article III jurisdiction exists.

## III.

But suppose the parties have conflicting interests at the outset of the suit, but then at some point, one side concedes that the other side has the stronger legal argument and should therefore prevail in the case. Can Article III jurisdiction exist at the outset, only to subsequently disappear, just because one side is willing to acknowledge the merits of the other side's position, rather than waste time and resources litigating unnecessarily?

Civility and collegiality enhances efficiency in the judiciary. No doubt that's one reason why courts value candor from counsel. And it doesn't deprive our court of jurisdiction.

For well over a century, the Supreme Court has made clear that "such amicable actions, so far from being objects of censure, are always approved and encouraged, because they facilitate greatly the administration of justice."

*Lord v. Veazie*, 49 U.S. 251, 255 (1850). So "[w]hen a plaintiff brings suit," "it is not any the less a case or controversy upon which a court possessing the federal judicial power may rightly give judgment, because the plaintiff's claim is uncontested or incontestable." *Pope v. United States*, 323 U.S. 1, 11 (1944).

In fact, the Supreme Court has repeatedly affirmed the jurisdiction of Article III courts to issue judgments in cases of party agreement. As the Supreme Court has explained, it doesn't matter whether the parties "agree" or even "welcome" an adverse result. All that matters is that both sides have asserted legitimately conflicting interests at the outset of the suit. *See*, *e.g.*, *INS v. Chadha*, 462 U.S. 919, 931 (1983) (Article III jurisdiction not defeated simply because both sides "agree with the holding that the statute in question is unconstitutional"); *id.* at 939 ("[T]here was adequate Art. III adverseness even though the only parties were the INS and Chadha. . . . [T]he INS's agreement . . . does not affect that agency's 'aggrieved' status for purposes of appealing that decision."); *United States v. Windsor*, 570 U.S. 744, 758 (2013) (Article III jurisdiction not defeated simply because both sides "welcome" finding of unconstitutionality, noting that jurisdiction existed in *Chadha* "regardless of whether the agency welcomed the judgment"); *Cardinal Chemical Co. v. Morton Int'l*, 508 U.S. 83, 88 n.9 (1993) ("finding Art. III adverseness even though the two parties agreed") (citing *Chadha*); *id.* at 104 (Scalia, J., concurring) ("I agree with the Court that the parties' total agreement as to disposition of this case poses no constitutional barrier to its resolution.") (citing, *inter alia*, *Chadha*); *cf. Camreta v. Greene*, 563 U.S. 692, 702 (2011) ("So long as the litigants possess the personal stake discussed above, an appeal presents a case or controversy, no matter that the appealing party was the prevailing party below."); *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 334 (1980) ("[A]ppeal may be permitted . . . at the behest of the party who has prevailed on the merits, so long as that party retains a stake in the appeal satisfying the requirements of Art. III.").

No. 25-20191

## IV.

Jurisdiction in the face of party agreement is also bolstered by practice.

A leading treatise observes that, in cases "involving genuinely adversary interests, but lacking any dispute as to facts or remedy," "[t]here may be a very real need to secure a judicial decree to establish status or rights, or assist in their enforcement, even though there is no present dispute." 13 WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 3530 (3rd ed. 1998).

The treatise provides a number of examples. "[A] court may grant a certificate of naturalization even though there is no opposition, and may render a decree establishing title despite the failure of defendants, possessed of a possibly conflicting claim, to challenge the plaintiff's title." *Id.*

Likewise, "it is clear that judgment may be entered after default or plea of guilty, or on consent of the parties." *Id.*

And the treatise notes the perverse incentives that would result under a contrary rule. "Any other conclusion would forestall the benefits achieved by judicially establishing a secure basis for future action, and would make it possible for unwilling obligors or guilty criminals to defeat judicial sanctions simply by avoiding any controversy over liability or guilt." *Id.*

Jurisdiction is further supported by the Supreme Court's longstanding practice of appointing amici curiae to ensure robust adversarial process in cases where the parties agree. "[W]hen faced with a complete lack of adversariness, we have appointed an *amicus* to argue the unrepresented side." *Cardinal Chemical*, 508 U.S. at 104 (Scalia, J., concurring) (collecting examples). *See*, *e.g.*, *Glossip v. Oklahoma*, 604 U.S. 226, 242 (2025) ("Because Oklahoma agrees with Glossip on the merits of his appeal, the Court appointed . . . *amicus curiae* to defend the judgment below."); *Windsor*,

No. 25-20191

570 U.S. at 760 ("The Court adopts the practice of entertaining arguments made by an *amicus* when the Solicitor General confesses error with respect to a judgment below, even if the confession is in effect an admission that an Act of Congress is unconstitutional.").[1]

## V.

The panel in *Pool II* reached the opposite conclusion. It held that, "where the parties agree on a constitutional question, there is no adversity and hence no Article III case or controversy." 87 F.4th at 733–34. To support that conclusion, *Pool II* invoked a trio of Supreme Court precedents.

I read those precedents differently. I read them to say that it's not party agreement that forecloses jurisdiction—it's the lack of conflicting interests between the parties at the outset of suit that forecloses jurisdiction.

Take *Lord v. Veazie*, 49 U.S. 251 (1850). To begin with (and as discussed above in Section III), *Lord* goes out of its way to affirm that "amicable actions . . . are always approved and encouraged, because they facilitate greatly the administration of justice." *Id.* at 255. And *Lord* makes clear that it's not the "amicable" agreement of the parties that caused the Supreme Court to decline jurisdiction. Rather, it's because there was "no real conflict of interest" among the parties in *Lord*: "The objection in the case before us is, not that the proceedings were amicable, but that there is no

---

[1] This is not to say that appointing amici curiae is required to ensure jurisdiction. Appointing amici curiae may be sensible in some cases, less so in others. We didn't appoint amici here, and I have absolutely no quarrel with that. Indeed, my whole point is that this is a prudential consideration, not a jurisdictional one. *See, e.g., Chadha*, 462 U.S. at 940 ("Of course, there may be *prudential, as opposed to Art. III, concerns* about sanctioning the adjudication of this case in the absence of any participant supporting [the challenged statute].") (emphasis added); *Windsor*, 570 U.S. at 756 (noting "the distinction between . . . the jurisdictional requirements of Article III and the prudential limits on its exercise" without appointed amici).

17

real conflict of interest between them; that the plaintiff and defendant have the same interest." *Id.*

A brief summary of the facts in *Lord* should help explain the point. In *Lord*, two relatives agreed to work together to exclude a third party from accessing a river. Their plan was two-fold: First, they entered into a contract with one another to allocate river access rights consistent with their common objective. *Id.* at 252. Second, one relative sued the other to secure judicial enforcement of their agreement—and thereby vindicate their common objective. *Id.* at 252–53. Not surprisingly, the Court found that the two relatives had "the same interest," and thus declined jurisdiction accordingly. *Id.* at 255.

The facts in *Moore v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 47 (1971), follow a similar pattern. The plaintiff there sued the school board to vindicate *the board's* interests. That is, the plaintiff wanted to help relieve *the board* from having to comply with the terms of a previously entered court injunction. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 312 F. Supp. 503, 505 (W.D.N.C. 1970).

So in *Moore*, as in *Lord*, the problem was "*not* that the proceedings were amicable," but that "the plaintiff and defendant have *the same interest*." 49 U.S. at 255 (emphasis added). *See also Muskrat v. United States*, 219 U.S. 346, 361 (1911) ("[T]he United States is made a defendant to this action, but it has *no interest adverse to the claimants*.") (emphasis added).

The rule that emerges from all of these Supreme Court precedents appears to be this: Jurisdiction is not foreclosed just because the parties agree. It's only foreclosed if the parties have common rather than conflicting interests at the outset of the suit.

A leading treatise has noted the same dichotomy: "Cases involving genuinely adversary interests, but lacking any dispute as to facts or remedy,

must be sharply distinguished from the decisions rested on the fact of common interests." 13 WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 3530 (3rd ed. 1998).

## VI.

If I've misread all of these precedents, I will happily admit the error, and alter my views accordingly. *See*, *e.g.*, *Planned Parenthood of Greater Texas, Inc. v. Kauffman*, 981 F.3d 347, 384 (5th Cir. 2020) (en banc) (Ho, J., concurring) ("as human beings, judges sometimes make mistakes," but "it is more important to get the law right than to guard our self-esteem").

But to be convincing, we must examine all of the relevant data points, and confront all of the legal arguments.

*Pool II* does not mention *Chadha* or *Windsor*. Nor *Cardinal Chemical* or *Pope*. Nor the various statements from *Lord* that I've quoted here.

To be sure, those cases weren't presented in *Pool II*. Because none of the parties disputed adversity in *Pool II*. But that just brings me back to where I began. I'm wary of issuing binding precedents in the absence of robust adversarial process.

Of course, federal courts are obliged to ensure that they have jurisdiction, whether the parties raise the issue themselves or not. But when a court raises a jurisdictional concern *sua sponte*, it may be good practice to request supplemental briefing, before issuing a published decision holding the parties in error for assuming jurisdiction. And in all events, we should identify and address all governing Supreme Court precedent.[2]

---

[2] Members of the court are welcome, of course, to opine that the Supreme Court is wrong—and that there's no jurisdiction in *Windsor* and *Chadha*, just as in *Lord* and *Moore* (and thus no jurisdiction in *Pool II* and the in-state tuition case). But it's not for us to hold.

No. 25-20191

\* \* \*

The absence of adversarial process in this case does not prevent me from concurring in the judgment, because the judgment binds only the parties who agree with that judgment.  But it does caution me against attaching to that judgment any pronouncements of law that will bind the citizens of our circuit in future cases.

That being said, it's only a prudential, rather than jurisdictional, concern that I express today.  I respect that my distinguished colleagues see it differently—and that they are confident in the Government's concession and accordingly comfortable with issuing a precedential decision in this case.